Island Creek Coal Company v. Commissioner.
Island Creek Coal Co. v. Commissioner
Docket No. 85616.
United States Tax Court
T.C. Memo 1962-138; 1962 Tax Ct. Memo LEXIS 172; 21 T.C.M. (CCH) 727; T.C.M. (RIA) 62138; June 5, 1962
*172 On January 1, 1956, petitioner acquired a going coal mining enterprise consisting of plants, equipment, and coal leaseholds in Virginia and West Virginia. Petitioner entered on its books the depreciable property so acquired as having a cost equal to the price paid to the seller for the entire coal mining enterprise. Petitioner allocated no cost to the coal leases acquired in the transaction. Respondent, in his deficiency notice, has disallowed $687,087 of the depreciation deduction claimed by petitioner on its return and in doing so has allocated $2,500,000 as the cost of the coal leases to petitioner. Held, that the tangible property purchased by petitioner was worth the price which petitioner allocated to it on its books and petitioner paid that much for it in the transaction. Held, further, that the coal leases acquired by petitioner were worth no more than the royalties which petitioner obligated itself to pay the lessors if, when, and as coal was mined. Petitioner paid nothing more than that for the leases. The depreciation disallowance which the Commissioner made in his deficiency notice is not sustained. Frederic A. Macdonald, Esq., Chafin Bldg., Huntington, W. Va. *173 , and Bert H. Early, Esq., for the petitioner. Mark H. Berliant, Esq., for the respondent. BLACK Memorandum Findings of Fact and Opinion Respondent determined a deficiency in income tax for the taxable year 1956 in the amount of $617,778.99. By stipulation the parties have agreed on a settlement of all the issues except that part of the deficiency determined by respondent as the result of his disallowance of an expense deduction in the amount of $687,087. The deduction was claimed by petitioner as part of the depreciation allowance on certain assets purchased on January 1, 1956, from Red Jacket Coal Corporation. Respondent in his brief says: All other adjustments per respondent's statutory notice of deficiency or issues raised through amended pleadings have been disposed of either through pleadings or by agreement of the parties as set forth in stipulated facts. * * * Effect will be given to these agreements of the parties in a computation under Rule 50. The issue before this Court is whether petitioner properly allocated the purchase price paid in its acquisition of a going coal mining operation between depreciable assets (physical plants and equipment) and *174 coal leases and, accordingly, whether the cost basis assigned by petitioner to depreciable assets was correct. Findings of Fact All facts stipulated by the parties are incorporated herein by this reference. Petitioner Island Creek Coal Company, sometimes hereinafter called Island Creek, a Maine corporation with its principal office in Huntington, West Virginia, timely filed its tax return for the year 1956 with the district director of internal revenue, Boston, Massachusetts. During the year 1956 and for many years prior thereto, petitioner has been engaged in the business of mining and selling bituminous coal produced in West Virginia, Virginia, and Kentucky. Petitioner is a leading coal company in both production and sales. In 1954, Island Creek was exploring possibilities of acquiring additional coal properties for further expansion. The future of the coal mining industry looked particularly good at that time. At approximately the same time, in the judgment of its officers, Red Jacket Coal Corporation, sometimes hereinafter called Red Jacket, a wholly owned subsidiary of W. M. Ritter Lumber Company, had to make a business adjustment and was faced with the alternatives *175 of expanding, or decreasing, or selling its coal producing interests. Sales negotiations between petitioner and Red Jacket began in 1955, the parties dealt at arm's length, and both parties were in a position to adopt alternative courses of action. Neither party was forced to act. In order for petitioner to determine whether or not it was ultimately interested in acquiring the assets of Red Jacket, and, if so, at what price, petitioner asked for and received the following information about Red Jacket: financial data, pension fund data, insurance program data, mining plans, coal reserve data, lease data, operating maps, flow sheets on tipples, sales patterns, and description of coals. Island Creek made through investigations of Red Jacket's coal reserves, leaseholds, facilities, and real estate and after examining Red Jacket's earnings and other relevant data, a price limit was formulated. Petitioner retained the consulting engineering firm, Robinson & Robinson, to prepare a report for Island Creek to help petitioner reach a decision as to the advisability of acquiring the Red Jacket assets. The report, dated November 21, 1955, was submitted to petitioner and consisted of a detailed *176 operating report of Red Jacket based on the assumption that Island Creek would acquire Red Jacket's assets and operate its mines. The Robinson & Robinson report contained, in part, the following estimates and figures: (a) 44,000,000 tons of well proved recoverable coal; (b) 19,000,000 tons of commercially minable reserves close to preparation plants which would require new openings; (c) potential reserves, not proved, in excess of 100,000,000 tons; (d) capital expenditures of $2,643,000 necessary to bring Red Jacket operations up to petitioner's standards; (e) anticipated annual production of 4,300,000 tons within 3 years of acquisition; and (f) operation costs of $3.62 per ton within 3 years of acquisition. The reported projections and estimates were based on a 240-workday year. The minutes of the meeting of the board of directors of Island Creek dated November 29, 1955, contain the following: Mr. Salvati reported that, following a careful investigation by the Management and by Robinson and Robinson, Consulting Engineers, of the coal mining properties of Red Jacket Coal Corporation, a wholly owned subsidiary of W. M. Ritter Lumber Company, and of the records of W. M. Ritter *177 Lumber Company with respect to its unleased coal reserves, and conferences between him and officials of the Lumber Company, he had, subject to the approval of the Boards of Directors of this company and of the Lumber Company, agreed on the basis for the acquisition by this company of the coal mining operations of Red Jacket and other property; that such basis is set out in a memorandum entitled "Red Jacket Acquisition - Agreed Basis of Acquisition," which was read to the members of the Board of Directors and discussed in detail; that the definitive documents necessary to embody the detailed terms and conditions and to consummate the acquisition have not yet been prepared; and that in the preparation thereof some further negotiating will be necessary with respect to items not covered by the memorandum. Mr. Salvati further reported that legal counsel advised that it would not be necessary to submit such proposed acquisition to the stockholders of this company in order to satisfy the laws of Maine or the provisions of the Charter or By-Laws of this company, and that stockholders approval will not be required by the New York Stock Exchange. Mr. Salvati recommended that the Board approve *178 of the acquisition of such properties * * * After further negotiations an acceptable price was agreed upon by the parties. On January 1, 1956, petitioner formally acquired from W. M. Ritter Lumber Company, hereinafter called Ritter, certain property formerly owned by Ritter's wholly owned subsidiary, Red Jacket, for a consideration of $1,000,000 in cash and 250,000 shares of petitioner's common capital stock having a fair market value of $8,421,875, making a total consideration of cash and stock amounting to $9,421,875. All the coal mining equipment, machinery, buildings, preparation plants, and other depreciable assets of Red Jacket at seven mines in West Virginia and Virginia known as Junior, Mitchell Branch, Wyoming, Keen Mountain, Red Jacket No. 17, and Coal Mountain Nos. 9 and 12 were acquired. In addition, petitioner acquired 12 leaseholds on which the seven coal mining operations were situated. Nine of the 12 leaseholds were acquired by petitioner through assignments in which Ritter or Red Jacket had been the lessee. These leases so assigned were (as known by the names of the lessors): United Thacker Coal Company, Thacker Land Company, Logan Coal and Timber Assn., U.S. Steel *179 Company, Cotiga Development Company (2 leases), J. Harvey Williams, and Yukon Pocahontas Coal Co. (Keen Mountain) - 2 leases. The remaining three leases were new leases on land owned by Ritter, which Ritter executed to Island Creek. These new leases were (as known by the name of the locality): Wyoming, Red Jacket, and Coal Mountain. Thacker Land Company was controlled by Ritter through ownership of 57 percent of its stock. United Thacker Coal Company is a subsidiary of petitioner. Ritter was one of the lessors in the Keen Mountain leasehold to the extent of an undivided one-third interest. Island Creek, through the purchase of all the Red Jacket assets, acquired a going coal mining business. The basic memorandum agreement entered on December 22, 1955, stated in part that: Whereas, Ritter desires to liquidate the [coal mining] business; and whereas, in furtherance of that liquidation, it desires to dispose of certain coal mining preparation plants and coal mining leaseholds * * * and Island Creek desires to acquire said assets * * * Under the Wyoming, Red Jacket, and Coal Mountain leases petitioner agreed to pay Ritter a tonnage royalty of 3 percent of the yearly average *180 selling price for each ton of coal mined by underground methods and in no event less than 15 cents per ton so mined. The leaseholds acquired by petitioner in the Red Jacket purchase were valuable assets whereby petitioner acquired the right to mine extensive coal reserves and the right to remove such coal. Petitioner became obligated to pay the royalties mentioned in each leasehold to the lessors as the coal was mined. The coal within the leaseholds held under leases from Logan Coal and Timber Assn., Thacker Land Company, Cotiga Development Company, and J. Harvey Williams had been largely mined out. The U.S. Steel Corp. lease was assigned with the consent of the lessor, as required by the terms of the original agreement. Paragraph 21 of the stipulation of facts is as follows: 21. Petitioner entered on its own books the depreciable property so acquired from Ritter at $9,399,170.00. This figure was the total consideration paid to Ritter after deducting $22,705.00 for assets transferred to subsidiary companies or resold as of the date of acquisition. The taxpayer placed the full cost on machinery and equipment, placing no value on the leases for tax purposes. Petitioner would *181 not have made the purchase if the coal leaseholds had not been included in the transaction. No value above the royalties to be paid was attributed by either petitioner or Ritter to the leases made by Ritter and assigned by Ritter to petitioner, nominal consideration being recited in the assignments. In order to establish a cost basis for the Red Jacket assets for book and tax purposes, petitioner appraised the depreciable property soon after the acquisition. Petitioner's appraisal of such property was $10,562,047, which amount was in excess of the purchase price of all the Red Jacket assets acquired. Petitioner then reduced its cost basis for each depreciable item to 88.45666 percent so that the basis for the depreciable property exactly equaled that of the purchase price. The adjustment was determined after deducting from the total purchase price the fair market value of certain items of property which were sold during 1956. The depreciable property was then entered by petitioner on its books at a total of $9,399,170. Petitioner did not place or allocate any value to the leasehold assets acquired in the transaction. The result was as follows: Value Factored
to Purchase
Appraised Value
Price (tax basis)
Mining depts.
$ 9,680,845.00
$8,643,261.00
Other depts.
857,265.00
755,909.00
Assets sold or transferred
23,937.00
22,705.00
Leasehold value
0.00
0.00
Total
$10,562,047.00
$9,421,875.00
*182 The tangible assets which Island Creek acquired from Red Jacket had a value and a cost basis at least equal to the figures which petitioner placed upon them on its books. Island Creek paid nothing, over and above the obligation to pay royalties to the lessors, for the leases which were assigned to it by Ritter and the three leases which were executed to it by Ritter at the time of the transaction. Opinion BLACK, Judge: On January 1, 1956, Island Creek purchased all the assets of a going coal mining operation known as Red Jacket Coal Corporation. The assets consisted of plants, equipment, and mining leases. Petitioner, on its books in the manner which we have described in our Findings of Fact, allocated the entire purchase price to the depreciable property acquired (plants and equipment) and it did not assign any cost to the leaseholds which were assigned to it and the three leaseholds which were executed to it by Ritter. Petitioner did obligate itself to pay the lessors, including Ritter in the three leases executed by it, the amounts of the royalties provided in the leaseholds. Petitioner did not pay or agree to pay, nor was it asked to pay, any bonus for the leaseholds or any *183 of them. There is no dispute as to the total cost of the Red Jacket assets so acquired, the consideration being $1,000,000 in cash and 250,000 shares of petitioner's common stock having a fair market value of $8,421,875, for a total consideration of $9,421,875. We have found as a fact that the selling price was fairly bargained for through arm's length negotiations and the price represents the full value of the assets acquired. The only dispute is as to the allocation of the purchase price between the two classes of exhaustible assets. Petitioner has assigned a zero basis to the leaseholds, claiming that they cost it nothing over and above the royalties which had been agreed upon in the leases. Respondent, on the other hand, contends that the leaseholds were a very valuable part of the acquisition and that petitioner's failure to allocate any part of the purchase price to the cost of the leaseholds was patently erroneous. He has disallowed a part of the depreciation deduction claimed by petitioner for the year 1956. It is that disallowance which is the only issue that we now have to decide. It is undoubtedly true that if the leaseholds in question had any cost basis to petitioner *184 in the transaction between it and Ritter over and above the royalties which were to be paid to the lessors as the coal was mined, then such cost basis would have to be taken into consideration in determining the amount of depreciation which petitioner is to be allowed. We have carefully considered the evidence in this case and the respective briefs of the parties. Quite a number of witnesses testified orally and many documents were introduced in evidence as exhibits. Manifestly, it would be impractical and well nigh impossible to discuss them all. We think it will suffice for us to say that we have carefully considered them and have concluded that the tangible assets which Island Creek acquired from Red Jacket had a cost basis to Island Creek equal to the amount set up for them by Island Creek on its books. It is also our conclusion from this evidence that the coal leases had no cost to Island Creek over and above the royalties which were to be paid to the lessors from time to time as the coal was mined. In other words, no bonus was paid for them by Island Creek at the time it acquired them in the transaction described in our Findings of Fact. We think that a comparatively recent *185 case, (C.A. 6, 1959), affirming a Memorandum Opinion of this Court, points the way for a decision in the instant case. In that case the court, in affirming us, stated as follows: The government claimed, and the Tax Court found, that although, in the contract of purchase of the assets, the cost was set forth as $1,000,000.00, the actual value of the tangible assets was $650,000.00, while the balance of the purchase price, in the amount of $350,000.00, was for intangibles in the nature of good will, or value as a going concern, which was not entitled to depreciation. The court further pointed out that: After a hearing, the Tax Court issued its opinion and decision, holding that petitioner had acquired the tangible assets enumerated in its contracts with the partnership at a cost of only $650,000.00, and that the balance of the purchase price, which it had paid, represented the cost of unspecified intangible assets. * * * The court, in affirming us, concluded with the following paragraph: In accordance with the views herein expressed, the decision of the Tax Court is affirmed for the reasons stated in the opinion *186 of Judge Forrester. We think that it is appropriate that we here quote the following paragraph in Judge Forrester's Memorandum Opinion: In summary, we are satisfied that the assets purportedly sold for $1,000,000 were in fact worth only $650,000, and that only $650,000 out of the $1,000,000 paid for the business is properly allocable thereto. Each tangible item has a cost to petitioner equal to 65 percent of the amount ascribed to it in the agreement. It has been stipulated in the instant case that: Petitioner entered on its own books the depreciable property so acquired from Ritter at $9,399,170.00. This figure was the total consideration paid to Ritter after deducting $22,705.00 for assets transferred to subsidiary companies or resold as of the date of acquisition. The taxpayer placed the full cost on machinery and equipment, placing no value on the leases for tax purposes. If, under the evidence in the instant case, we could hold that the Commissioner was correct in his determination that the leaseholds had a value of $2,500,000 and that only the balance which was paid by Island Creek, as purchaser, to Red Jacket, as seller, should be allocated to the tangible assets we *187 would have a comparable situation before us such as was present in the Copperhead Coal Co. case, supra. But we cannot make any such finding of fact. We think petitioner has met its burden of proof and has shown by clear and convincing evidence that the coal leaseholds had no such value as the $2,500,000 which the Commissioner has attributed to them and has proved that nothing was paid for them except petitioner's obligation to pay the royalties specified in the leases if, as, and when the coal was mined. It also has proved, we think, that the tangible assets which it acquired in the transaction were worth the full amount which was paid to Ritter in the transaction. In other words, the price was paid for them which petitioner contends. As to this issue, we hold in favor of the petitioner. A Rule 50 settlement will be necessary because of other issues which have been settled by the pleadings and by agreement in the stipulation. Decision will be entered under Rule 50.